UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

UNITED STATES OF AMERICA

                                           15 Cr. 388 (JBW)

               -against-

SHAMEKE WALKER,

                               Defendant.

----------------------------------------------------------------------- x

**SENTENCING MEMORANDUM FOR**
**DEFENDANT SHAMEKE WALKER**

MICHAEL HUESTON, ESQ.
*Attorney for Defendant Shameke Walker*
16 Court Street, Suite 1800
Brooklyn, New York 11241
(718) 246-2900

Dated:       Brooklyn, New York
               May 9, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

UNITED STATES OF AMERICA

                                     15 Cr. 388 (JBW)

             -against-

SHAMEKE WALKER,

                         Defendant.

-------------------------------------------------------------------- x

**SENTENCING MEMORANDUM FOR
DEFENDANT SHAMEKE WALKER**

**A.     Introduction**

      Defendant Shameke Walker places before the Court the following issues relating

to his appropriate sentence pursuant to Fed. R. Crim. P. 32.

      On July 15, 2016, Mr. Walker was found guilty by jury verdict of Counts One

through Three of a four-count, second-superseding indictment.  On July 18, 2016, he was

found guilty by jury verdict of Count Four of the same four-count superseding

indictment.

      Count One charged a violation of 18 U.S.C. § 1951(a) (Hobbs Act Robbery).  It

alleged that on or about June 13, 2015, Mr. Walker obstructed, delayed and affected

commerce, and the movement of articles and commodities in commerce, by robbery of

United States currency and commercial merchandise from an employee of a convenience

store located at 669 Stanley Avenue, Brooklyn, New York.  Count Two charged a

violation of 18 U.S.C. § 1951(a) that duplicated the allegations in Count One except

added that Mr. Walker committed and threatened physical violence to John Doe # 1 and

John Doe # 2[1] in furtherance of the robbery.  Count Three alleged that Mr. Walker used a firearm in relation to Counts One and Two in violation of 18 U.S.C. § 924(c).[2]  Count Four alleged that on or about June 13, 2015, Mr. Walker was a felon in possession of Aguila 9mm Luger ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).  *See* Presentence Investigation Report ("PSR") at ¶¶ 1-5.

Mr. Walker was arrested and detained on July 15, 2015, and taken into federal custody the following day.

The central issue at sentencing is the extent to which Mr. Walker's criminal history makes him an Armed Career Criminal or Career Offender.  The parties submitted memorandum regarding this issue earlier this year.  *See* Parties' Submissions at Docket Nos. 138 and 139.

It is the defense's position that Mr. Walker's criminal history does not require the application of a mandatory minimum sentence or a Career Offender designation because: (1) with respect to the Career Offender Guideline, the "instant offenses" are not "crimes of violence," and (2) with respect to both the Career Offender Guideline and the Armed Career Criminal Act, Mr. Walker's relevant prior convictions are neither "violent felonies" nor "crimes of violence."  Mr. Walker refers the Court to his January 12, 2018 letter, Docket No. 139, and incorporates it by reference herein.

Mr. Walker additionally argues that the Court not impose the contemplated mandatory minimum sentences in this case, as they unconstitutionally violate the

---

[1] John Doe # 1 is the "employee" referred to in Count One.  At trial, the government was precluded from introducing evidence or arguing to the jury about the commission and threatened physical violence to John Doe # 2.

[2] The jury returned a verdict Mr. Walker brandished and discharged a firearm.  *See* Verdict Sheet at Document 115.

separation of powers' doctrine.

**1.      Parties' Guideline Calculations and Views of the Statutory Provisions**

   **a.  Defense's Position**

Mr. Walker's combined adjusted offense level is either 20 or 24 based on the following analysis.  Assuming Count Two is not dismissed (as sought in the defendant's January 8, 2018 letter at Part VI), Mr. Walker is level 24, pursuant to U.S.S.G. §§ 2B3.1(a) and 2B3.1(b)(3)(B) (Serious Bodily Injury).  If Count Two is dismissed, then Mr. Walker is level is 20, pursuant to U.S.S.G. §§ 2B3.1(a).  On Count Four his adjusted offense level is 14, pursuant to U.S.S.G. § 2K2.1(6).

Counts One, Two, and Four are all grouped, pursuant to U.S.S.G. § 3D1.2(a) since they all represent an incident involving the same robbery of 669 Stanley Street in Brooklyn.

Count Three is not subject to grouping pursuant to U.S.S.G. §§ 3D1.1(b) and § 2K2.4(b), and its statutory terms of imprisonment run consecutively to that of any other term of imprisonment.  *See* 18 U.S.C. § 924(c)(1)(A).  If the "discharge" the jury found relates only to Count Two, and that count is dismissed, then Mr. Walker would be subject to 18 U.S.C. § 924(c)(1)(A)(ii)'s minimum term of imprisonment of seven years.  If the count is not dismissed or the "discharge" relates to Count One, as well, then Mr. Walker would be subject to 18 U.S.C. § 924(c)(1)(A)(iii)'s minimum term of imprisonment of 10 years.

Mr. Walker's Criminal History Category is V.

Assuming Count Two is dismissed and the "discharge" is not applied, Mr. Walker's advisory Guidelines range is 147 to 162 months after adding the mandatory

minimum of seven years and the otherwise applicable advisory Guidelines' range of 63 to 78 months.

Assuming Count Two is not dismissed, or that the discharge relates to Count One, Mr. Walker's advisory Guidelines range is 212 to 275 months after adding the mandatory minimum of 10 years and the otherwise applicable advisory Guidelines' range of 92 to 115 months.

For Counts One and Two, the maximum terms of imprisonment are 20 years.  18 U.S.C. § 1951(a).  On Count Three, the minimum term of imprisonment is either 7 years, or alternatively 10 years, and the maximum term is life. 18 U.S.C. § 924(c)(1)(A)(ii) and (iii).  On Count Four, the maximum term of imprisonment is 10 years. 18 U.S.C. §§ 922(g) and 924(a)(2).

### b.    Probation's and the Government 's Position

According to Probation and the Government, Mr. Walker's combined adjusted base offense level is 34, based on U.S.S.G. § 4B1.4(b)(3)(A), which provides for a base offense level of 34 for offenses committed by an Armed Career Criminal, where a firearm is used in a crime of violence, and the advisory Guidelines range is 360 months to life.  *See* PSR at ¶¶ 15-34, 47, 88, 89.  Probation and the Government also assert that Mr. Walker's Criminal History Category is VI based on their view he is a Career Offender. *See* PSR at ¶ 47.

Probation and the Government argue that Mr. Walker is an Armed Career Criminal.  If correct, Mr. Walker would be subject to a minimum term of imprisonment of 15 years and a maximum term of life on Count Four.  18 U.S.C. § 924(e).  PSR at ¶¶ 88, 89.  Further, in the view of Probation and the Government, this would be followed by

a 10-year mandatory minimum on Count Three, an effective 25-year mandatory minimum.

### 2.      Defendant's Request for a Non-Guidelines Sentence

We submit that the 18 U.S.C. § 3553(a) factors justify a downward variance from the advisory Guidelines range to impose time served on Counts One, Two and Four to run concurrently to each other, and no more than 84 to 120 months of incarceration on Count Three, so as to reflect a sentence that is sufficient but not greater than necessary to achieve the sentencing objectives of the statute.

This would be reasonable considering the objectives of 18 U.S.C. § 3553(a), including Mr. Walker's history and characteristics, the nature of the offense, the need for general and specific deterrence, the need to provide educational or vocational training, and to avoid sentencing disparities.  In particular, Mr. Walker asks the Court to focus on his adverse socio-economic circumstances, lack of youthful guidance and drug dependency, which converged to have a powerful influence on him.  Inclusion of these factors in the calculation is consistent with the mandate that sentencing courts take into consideration all relevant facts related to defendants' backgrounds and histories.  The imposition of a sentence based upon a sentencing regime that fails to include critical information related to defendants' backgrounds circumvents this obligation.

Mr. Walker chose to exercise his constitutional right to trial and lost.  He should not be subject to an extraordinary and an irrational "trial penalty" for exercising his constitutional right.  *See United States v. Holloway* 68 F. Supp. 3d 310, 313 (E.D.N.Y. 2014), ("The difference between the sentencing outcome if a defendant accepts the

government's offer of a plea bargain and the outcome if he insists on his right to trial by jury is sometimes referred to as the "trial penalty").

We respectfully suggest that the consequence for losing at trial is the province of U.S.S.G. § 3E1.1(a) and (b) (acceptance of responsibility).  The penalty sought by Probation and the Government is so harsh that would be "laughable" if there was not a real person on the receiving end of it.  *See Holloway,* 68 F. Supp. 3d at 312.  *See also United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *United States v. Kupa*, 976 F. Supp. 2d 417 (E.D.N.Y. 2013) (criticizing the use of recidivism-based enhancements of the drug offense mandatory minimum sentences to coerce guilty pleas and to punish those who refuse to plead guilty).

### B.      Request For A Stay

The Supreme Court, in *Sessions v. Dimaya*, No. 15-1498, __ U.S. __, 2018 WL 1800371 (Apr. 17, 2018), struck down as unconstitutionally vague a provision of the Immigration and Nationality Act which dealt with the power of the government to deport any alien, including a lawful permanent resident, convicted of an "aggravated felony." This provision defines "a crime of violence" to include any offense that "is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  This ruling may affect the Second Circuit's decision in *United States v. Hill*, No. 14-3872, 832 F.3d 135, 145-50 (2d Cir. 2016)), which rejected a constitutional vagueness challenge to 18

U.S.C. § 924(c)'s residual clause, and is currently pending.

Further, the Supreme Court has also granted a petition for certiorari in *Stokeling v. United States*, No. 17-5554, a case concerning the definition of "violent felony" under the Armed Career Criminal Act.  There, the issue is whether a state robbery offense that includes "as an element" the common law requirement of overcoming "victim resistance" is categorically a "violent felony" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(i), when the offense has been specifically interpreted by state appellate courts to require only slight force to overcome resistance.

These issues bear directly on Mr. Walker's sentence, including whether the 15-year Armed Career Criminal Act mandatory minimum or Career Offender designation apply to him.  The Court denied the parties' application to stay this case to give time for the Second Circuit to reconsider its decision in *Hill*, and for the Supreme Court to decide *Stokeling*, *see* Dkt. No. 146 ("The issues raised in the letter will be addressed at the time of sentencing"), Mr. Walker renews this request because the stay would obviate the need for any future remands if the law changes, and provide Mr. Walker with more certainty.

## C.      Comments and Objections to the Presentence Report

By letter dated March 6, 2018, the defense submitted its objections and comments to the PSR.  A copy of that letter is attached hereto as Exhibit A.  In addition to the objections contained therein, we take issue with not only the recommendations contained in the final, revised report, but the reasoning given in support of those recommendations.

Further PSR Addendum appears to misstate Mr. Walker's objection regarding the use of the November 1, 2015, Sentencing Guidelines Manual, by suggesting that the defense "stat[ed] that the events which occurred with respect to the commission of the instant offense occurred during the time period when the November 1, 2014, Sentencing

Guidelines Manual was in effect, citing U.S.S.G. §1B1.11(a)." The defense made no such assertion. *See* Exhibit A. Rather, it is Mr. Walker's position that the November 1, 2016 Sentencing Guidelines Manuel should be used because "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." *See* U.S.S.G. § 1B1.11(a).

**D.    Mr. Walker's History and Characteristics**

Information relating to Mr. Walker's background and characteristics is detailed in the PSR at ¶¶ 56-87, and in the letter of support, attached as Exhibit C. The following discussion draws from this source material and other items where noted.

Mr. Walker is a 44-year old African American citizen of the United States. He was born to the consensual union of James Kearse and Delores Walker (now age 62), in Brooklyn, New York. Mr. Kearse and Ms. Walker had a second son, who died when Mr. Walker was a boy. After his baby brother's death, Mr. Walker had minimal contact with his father. At age 18, he forever lost the opportunity to know his father, when Mr. Kearse was murdered in South Carolina. Mr. Walker's mother abused alcohol and drugs throughout Mr. Walker's childhood. She would leave her young son alone for extended periods of time. On one of these occasions, the New York City Administration for Children's Services (ACS) placed Mr. Walker in foster care. When his maternal grandmother, Joanne Walker, learned of this placement, she assumed custody of him. Mrs. Walker is now 82 years old. She is blind and was recently hospitalized for hypertension.

Mr. Walker did not return to his mother's care until 1992. However, his mother continued to use drugs until the birth of his maternal half-sister who was born addicted to crack cocaine. After further ACS involvement, his mother eventually stopped using

drugs.  She is now employed as a teacher at a day care center in Syracuse, New York, where she resides.

Mr. Walker resided in Brooklyn until 1995, except while incarcerated from March 1991 through September 1992.  In 1996, Mr. Walker relocated to Orangeburg, South Carolina, where he resided until 1999, at which time he was incarcerated there.  After being released in 2006, he returned to Brooklyn.

Although Mr. Walker describes his upbringing as "middle class," it clearly was not.  Mr. Walker grew up economically and emotionally impoverished in an environment known to result in severe psychological trauma during childhood development, which manifests as hopelessness, depression, aggression, impulsivity, delinquency and a reliance on gangs to counteract feelings of despair and powerlessness.[3]

Mr. Walker, who was not only neglected but emotionally abused as a child, has a history of mental illness.  He was designated by the Department of Education as an emotionally disturbed child and placed in special education classes.  He has a history of depression, suicidal ideation and psychosis, resulting in a psychiatric hospitalization.

While incarcerated at Spofford Detention Center in the Bronx, at age 14, he was charged with an additional offense, but was told that if he completed psychiatric treatment, the charges would be dismissed.  Mr. Walker was placed at Bellevue Children's Psychiatric Hospital, in New York, New York, for three months in 1988, but as his problems did not improve, he was transferred to the Manhattan Children's Psychiatric Center in 1989.

---

[3] *See* articles at *www.justice.gov/defendingchildhood/pub-research.html* under "general" heading.

Mr. Walker also has a history of substance abuse, including alcohol, marijuana and K-2 (synthetic marijuana) use.  He has fought to recover and maintain sobriety by completing treatment for alcohol and substance abuse dependency that included individual and group counseling, and received mental health services.

Mr. Walker attended Thomas Jefferson High School, in Brooklyn, for two months in 1988, but withdrew due to psychiatric problems and a prior local arrest.  Mr. Walker obtained his General Educational Development (GED) Diploma through a program offered at Alianza Dominicana, in New York, New York, in 1993.   He attended one semester of college at LaGuardia Community College, in Long Island City, but eventually withdrew.  Before his incarceration in this matter, Mr. Walker made efforts to learn medical billing and coding.

Mr. Walker has never been married.  His only child, a daughter, died at age two from respiratory problems that she suffered from birth.  The child's health problems followed from those of her mother, Rushia Williams, who had hypertension and adult-onset diabetes at the start of her pregnancy, and suffered a stroke and a heart attack during the pregnancy.

Although they are not in a relationship, Ms. Williams is still close with Mr. Walker.  She has three biological children and five adoptive children.  They are aware of Mr. Walker's current legal circumstances and remain supportive.

Mr. Walker has been involved in a relationship with Minyon Mitchell since 2006, and lived with her from 2013 until he was arrested in this case.  In March 2014, Ms. Mitchell miscarried their child during her second trimester.  Ms. Mitchell has three minor children from previous relationships.  Ms. Mitchell and her children have been negatively

affected by the Mr. Walker's legal situation, and her children have been acting out as a result of his arrest and incarceration.

**D.      Offense Conduct and Adjustment to Incarceration**

Mr. Walker has been incarcerated since his July 2015 arrest, and been detained at the Metropolitan Detention Center ("MDC") since.   He has participated in many educational programs at the MDC, including Health Education, Leadership, Resume, and Chess programs.  *See* attached certificates at Exhibit B.

**E.      Mr. Walker's Sentence Must Not Be Greater Than Necessary to Achieve the Goals of 18 U.S.C. § 3553(a) and Must Take into Account His History and Characteristics**

Mr. Walker has been incarcerated for approximately 34 months.  He respectfully requests that the Court impose a non-Guidelines sentence of time served on Counts One, Two and Four to run concurrently to each other, and no more than 84 to 120 months of incarceration on Count Three to reflect a sentence that is sufficient but not greater than necessary to achieve the sentencing objectives of the statute.

Even in the post-Booker era, the Sentencing Guidelines remain the sentencing regime of choice for Probation and Government in virtually every case.  However, this Court is not required to impose a sentence based on the advisory Guidelines or based on any policy of the Sentencing Commission that circumvents or curtails courts' roles in sentencing.  *Pepper v. United States*, 562 U.S. 476, 501 (2011).

In this case, in light of critical factors in Mr. Walker's background, a sentence at variance with the advisory Guidelines is required.  Sentencing courts must consider the backgrounds and histories of offenders in arriving at sentences that are sufficient but not greater than necessary to reach the goals set forth in 18 U.S.C. § 3553(a)(2).  The advisory Guidelines, on the other hand, disregard critical parts of defendants' makeup by

failing to address in an individualized manner, defendants' histories and characteristics, such as socio-economic status, lack of guidance as a youth, and drug and alcohol dependency.  *See* Guidelines §§ 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction), 5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status), and 5H1.12 (Lack of Guidance as a Youth and Similar Circumstances).  When defendants' backgrounds and characteristics are ignored, marginalized, or reduced to second-class status, the goal of informative, individualized sentencing cannot be achieved.

Understanding and acknowledging defendants' backgrounds is critical because such knowledge assists courts in determining sentences that are sufficient but not greater than necessary to reach the goals of sentencing.  Without such knowledge regarding the factors that influenced defendants, they are left to the mercy of mathematical numbers that arrive at terms of incarceration with zero empirical relationship to either punishment or the causes that brought them before the court for sentencing.  *See United States v. Diaz*, No. 11-CR-00821-2 (JG), 2013 U.S. Dist. LEXIS 11386 (E.D.N.Y. Jan. 28, 2013).

The illogic of this is shown by the fact that the advisory Guidelines arrive at sentencing ranges that include offenders' criminal histories to aggravate their sentences but fail to include any relevant mitigating circumstances in offenders' backgrounds.  This lopsided formula fails to balance the important interplay between aggravating and mitigating sentencing factors, which must be considered in order to arrive at sentences that adequately considers offenders' backgrounds.

Mr. Walker is not blameless, but he is not responsible for the circumstances he was born into.  His sentence must balance the circumstances relevant to his life history

and provide him with rehabilitation.  Your Honor observed how adverse socio-economic

conditions affect defendants and their relationship with the criminal justice system,

stating:

> Had the defendants been raised by cohesive, adequate
> families, most of the difficulties they encountered would
> probably never have come to pass.  Well-resourced,
> attentive parents would have had the knowledge, ability,
> and insight to protect their children from many of the
> difficulties that befell these defendants in their youth, to
> obtain assistance to deal with their psychological and
> physical problems, and to obtain crucial opportunities for
> education, work, and personal growth.  Even those with
> learning disabilities would likely have been provided
> available resources to overcome their impairments at public
> expense.  That the defendants were born into circumstances
> without such support is at the center of this tragedy.

*United States v. Bannister*, 786 F. Supp. 2d 617, 688-89 (E.D.N.Y. 2011).  Mr. Walker

grew up in a chaotic and neglected environment with an absent father and a drug-addicted

mother.  He was placed in foster care, then sent to jail and psychiatric hospitals as a

juvenile.  Mr. Walker's grandmother tried to fill the void.  However, her well-intended

efforts were not enough to counteract the damage caused by his deprivation.  *See* PSR at

¶¶ 57, 58, 69-72, 75; and Exhibit C.

Mr. Walker never had the opportunity to attend well-resourced, much less elite

schools.  Mr. Walker's sentence should reflect his history and a variance from the

advisory Guidelines should be applied.

Furthermore, to cope with his circumstances, Mr. Walker has used alcohol and

controlled substances.  While drug or alcohol dependence or abuse is not considered

relevant under the Guidelines, *see* Guideline § 5H1.4, an effort to end drug or alcohol

dependence through rehabilitation may be.  *United States v. Maier*, 975 F.2d 944, 948 (2d

Cir. 1992) (the Second Circuit held that the awareness of one's drug dependence "and the

demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society," is a reason for an adjustment).  Mr. Walker has benefitted from drug and alcohol treatment in the past, and asks the Court to recommend that he be provided with drug treatment while incarcerated.

Mr. Walker's mental health is another basis for a non-Guidelines sentence. Pursuant to 18 U.S.C. § 3553(a)'s mandate sentencing courts should consider the need to provide medical care, or other treatment to offenders.  Even under the Guidelines regime, a defendant's physical condition "may be relevant in determining whether a departure is warranted, if, individually or in combination with other offender characteristics, it is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." *See* U.S.S.G. § 5H1.4; *see also*, *United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's medical condition and charitable and civic good deeds warranted downward departure). Mr. Walker has a documented history of depression and psychosis and has been hospitalized for these conditions.  So this factor should also be considered.

Even though Mr. Walker is not a young man, he has always been vulnerable to impulsivity, which was compounded by the caustic environment and negative influences he grew up in.  This also should be considered in assessing his characteristics.

Despite many hardships, Mr. Walker has struggled to better himself.  Mr. Walker received his GED, and he is presently a tutor, and has completed an entrepreneurship class while at the MDC.  Mr. Walker's sentence should reflect these efforts because they demonstrate his struggle to improve his life, and weigh in favor of a variance.

Mr. Walker's family ties are also significant, and his absence has been deeply felt, as his mother describes, "My son had a hard life since he came into this world. I was a teenager when I had him during this time I was an alcoholic. He spent his life being in an out of jail. My son is not a bad child it's just people places and things that have my son in jail. He had never disrespected me. I love my son he is my only son so please spare his life. Right now I have been diagnosed with chronic obstructive pulmonary disease. Please allow me and my son to spend time with each other. He do has some good qualities about him." *See* Exhibit C.

It is also relevant that Mr. Walker has been incarcerated at the MDC for approximately 34 months. His confinement conditions should be considered in determining his appropriate sentence. *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.") *See e.g., United States v. Hernandez-Santiago*, 92 F.3d 97, 101 (2d. Cir. 1996) ("harsher incarceration" in state facility as compared to federal facility justified sentencing adjustment; the government did not challenge adjustment on appeal); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (pre-sentence conditions "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines.")

Finally, the length of Mr. Walker's incarceration as a general and specific deterrent is another factor that needs to be considered in the sentencing analysis. *See* 18 U.S.C. 3553(a)(2)(B). A recent order issued by Your Honor in *United States v. Lawrence*, 254 F. Supp. 3d 441 (E.D.N.Y. 2017) analyzed the issue of whether a longer

jail sentence will necessarily have a "deterrent effect on future gun crimes." *Id.* at 443. After listening to testimony from both experts the Court agreed with the defense expert that "[a] decision not to commit the crime requires knowledge by the would-be-offender of the law prohibiting the act, the risks of detection, and the risks of punishment; it assumes that each potential offender is capable of rationally weighing the costs and benefits of decision." *Id.*   Your Honor also noted that would-be-offenders "would have to have some idea of what sentence was ultimately imposed on [the *Lawrence* defendant,] appreciate the likelihood of detection and of the federal sentencing guidelines, and engage in a rational cost-benefit analysis. This process is unlikely…" *Id.* at 446. Therefore, the Court concluded that "imposing a long incarcerative sentence on [the defendant] in order to deter future gun violence [either by the defendant] or by members of the community seem[ed] futile." *Id.*

Your Honor also discussed long prison sentences' adverse effects on the communities:

> [D]efendants are usually incapable of making substantial contributions to their communities and families while they are incarcerated after a long sentence has been served.  The large number of people who come from deprived communities and are imprisoned, and their absence while in prison, has a disastrous political, social, and economic effect on their communities and on the families they come from or missed having.

*Id.* at 447.  Your Honor also noted that "[t]he compassion and empathy due a defendant denied an appropriate middle-class upbringing and education should, in theory, have no effect in calculating deterrence elements.  But they do." *Id.*   In this context, imposing a prolonged sentence on Mr. Walker would not serve either specific or general deterrent purposes, *see* U.S.S.G. §4A1.3, and moreover would contribute to community harm.

**F.**     **The Mandatory Minimums Sentences Contemplated in this Case Should Be Declared Unconstitutional**

Mr. Walker faces a mandatory minimum on Count Three and a 15-year mandatory minimum on Count Four.

At the outset of the sentencing reform movement, the Sentencing Guidelines were challenged as delegating legislative authority to the Sentencing Commission in violation of the separation of powers doctrine.  In *Mistretta v. United States*, 488 U.S. 361 (1989), the Supreme Court rejected this challenge, and upheld the constitutionality of the advisory Guidelines.  But it did so, in part on the ground that the Sentencing Commission had been placed within the Judicial Branch.  *Id.* at 390, 391.  In holding the advisory Guidelines constitutional, the Court added an important caveat: "had Congress decided to confer responsibility for promulgating sentencing guidelines on the Executive Branch, we might face the constitutional question where Congress unconstitutionally had assigned judicial responsibilities to the Executive or unconstitutionally had united the power to prosecute and the power to sentence within one Branch."  *See* Mistretta, at 391 fn. 17.

The constitutional questions the Court envisioned in *Mistretta* are now ripe.  This is especially true since *United States v. Booker,* 543 U.S. 220 (2005).  Specifically, since *Mistretta*, the statutory requirement of mandatory minimum sentences has united the powers of prosecuting and sentencing within the Executive Branch.  This is because the Executive Branch, through the Department of Justice, dictates to the Judicial Branch, the minimum sentence that can be considered in certain cases by its charging policy.  This case, which contemplates the imposition of two mandatory minimums regardless of any sentencing determination made by the court after considering the 18 U.S.C. § 3553(a) criteria, is yet another example of the Executive Branch usurping the Judicial Branch's

sentencing authority.  Sentencing is the most significant role played by the judiciary in the administration of our criminal justice system.  The constitution does not allow the restructuring of the judiciary's role in sentencing to that of merely rubber-stamping the will of Congress as interpreted by the Executive Branch.

Sentencing has traditionally contemplated an individual consideration of the circumstances in each case and defendant.  "It is necessary to individualize each case, to give that careful, humane and comprehensive consideration to a particular situation of each offender which would be possible in the exercise of discretion." *Burns v. United States*, 287 U.S. 216, 220 (1932).  "The fair method of sentencing is for an impartial judge, who is fully cognizant of an individual defendant's personal character, family responsibilities, medical and mental conditions, criminal record, and the particular circumstances surrounding the crime, to impose a sentence after deep reflection, informed by the judge's experience in life and in the law." *United States v. Sidhom*, 144 F. Supp. 2d 41, 42 (D. Mass. 2001).[4]

Mandatory minimums sentences remove the core elements of just sentencing from courts' considerations.  Hobbling the Court's consideration of all appropriate § 3553(a) matters prevents Mr. Walker from receiving the individualized sentencing determination to which he is constitutionally entitled.  Thus, the contemplated mandatory minimums violate Mr. Walker's right to due process, and should not be considered.  *See United States. Patillo*, 817 F. Supp. 839, 841 (C.D. Cal. 1993) ("The court postponed sentencing several times in the hope of finding some reasoned basis for holding that precedent does not bind the court.  This, however, has proved impossible"); *United States v. Langmade*,

---

[4] While *Sidhom* discusses the Sentencing Guidelines in effect at that time, the opinion equally applies to mandatory minimums.

125 F. Supp. 2d 373 (D. Minn. 2001); and *United States v. Watts*, 775 F. Supp. 2d 263, 266 (D. Mass. 2011) ("It is a painful, and often noted, irony that the United States of America — the land of the free and the home of the brave — leads the world in the rate of incarcerating its citizens.")  *See also United States v. Rowe*, 414 F. 3d 271 (2d Cir. 2005) (On appeal, the Second Circuit held that, based on *United States v. Pabon-Cruz*, 391 F. 3d 86 (2d Cir. 2004) a "violation of § 2251(c) did not require imposition of a 10-year mandatory minimum sentence.")

Indeed, Your Honor, noted how much the judiciary's hands have been tied by mandatory minimums in *United States v. Rivera*, 281 F. Supp. 3d 269, 286 (E.D.N.Y. 2017), where the Court stated, "Mandatory minimums eliminate the ability of judges to take into account the full range of sentencing considerations under 18 U.S.C. 3553, and deny defendants' the opportunity to benefit from alternatives to incarceration.  *United States v. Dossie*, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012 ('[Mandatory minimums] strip criminal defendants of the due process rights we consider fundamental to our justice system.')."

Thus, the prosecutor, representing the Executive Branch, by choosing what charges to file, has limited the sentencing authority of this Court.  This violates the separation of powers' doctrine as contemplated by the Supreme Court in *Mistretta*, and therefore the requirement of the imposition of the mandatory minimum sentences, in Mr. Walker's case, should be ruled unconstitutional.

### G.    Conclusion

We respectfully urge the Court to vary from the advisory Guidelines range based on the 18 U.S.C. § 3553(a) factors set forth in this memorandum and respectfully requests that the Court imposes a non-Guidelines sentence of time served on Counts One, Two and Four to run concurrently to each other, and no more than 84 to 120 months of incarceration on Count Three.  That is a significant life-changing penalty that amply punishes Mr. Walker for his offense conduct, maintains and encourages respect for the administration of justice, and serves as individual and general deterrents.  It is, in short, a sufficient, but not greater than necessary sentence.

Mr. Walker respectfully reserves the right to raise additional issues, if necessary, at the time of sentencing.

Dated:        Brooklyn, New York
              May 9, 2018

                              Respectfully submitted,


                              ____s/_____
                              MICHAEL HUESTON, ESQ.
                              *Attorney for Defendant Shameke Walker*
                              16 Court Street, Suite 1800
                              Brooklyn, New York 11241
                              (718) 246-2900

**DECLARATION OF SERVICE**

Michael Hueston, declares under penalty of perjury and pursuant to 28

U.S.C. § 1746, that the following is true and correct:

On May 9, 2018, I served the annexed Sentencing Memorandum and

Exhibits on:

Lindsay Gerdes and Andrey Spektor
Assistant United States Attorneys
United States Attorney for
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

[X]   BY ELECTRONIC CASE FILING
[X]   BY EMAIL
[ ]   BY HAND
[ ]   BY FIRST CLASS MAIL
[ ]   BY FACSIMILE WITH PERMISSION

Dated:      Brooklyn, New York
            May 9, 2018

___s/_____
MICHAEL HUESTON, ESQ.
*Attorney for Defendant*
16 Court Street, Suite 1800
Brooklyn, New York 11241
(718) 246-2900